William MARCO, as Administrator of all and singular, the goods, chattels and credits of Harry Marco, Deceased, a stockholder of Blue Ridge Corporation, now Blue Ridge Mutual Fund, Inc., on behalf of himself and all other stockholders similarly situated, and on behalf of Blue Ridge Corporation, now Blue Ridge Mutual Fund, Inc. and Ridge Realization Corporation, as assignee of Blue Ridge Corporation, Plaintiff,

v.

The BANK OF NEW YORK--and--Arthur H. Dean, as the Executors of the Estate of John Foster Dulles, Deceased, Sidney J. Weinberg, Waddill Catchings, Walter E. Sachs, Arthur Sachs, Howard J. Sachs, Henry S. Bowers, Louis E. Kilmarx, Blue Ridge Corporation, now Blue Ridge Mutual Fund, Inc. and Ridge Realization Corporation, Defendants.

Civ. A. No. 130–290.

United States District Court
S. D. New York.

June 29, 1967.

David M. Palley, New York City, for plaintiff.

Fennelly, Douglas, Eagan, Nager & Voorhees, New York City, for Blue Ridge Corp. and Ridge Realization Corp., Leo C. Fennelly, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants The Bank of New York and Arthur H. Dean, as Executors, etc., Milton Pollack, and Henry N. Ess III, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

Begun in 1936 and tried in 1967, this litigation is an unfortunate exemplar of the Jarndyce v. Jarndyce genre. See Holdsworth, Charles Dickens As A Legal Historian (1929) 79–115; Vaughan, Dickens and His Lawyers, 41 ABAJ 595, 597–598 (1955). From September, 1936

until January 7, 1958, the case was in the New York State courts, shuttling back and forth between the motion parts of the Supreme Court, the Appellate Division of the Supreme Court and the Court of Appeals. A volume is required simply to record the docket entries of the labyrinthine proceedings.

After the case was dismissed on January 7, 1958 in the State courts, it started its federal career on March 5, 1958 in this Court. Despite the use of a broad spectrum of pretrial techniques, it has taken over eight years to bring this controversy to trial. At last, on twelve days in May and June, 1967, the case was tried.

In a decision, early in the history of the case in this court, denying defendants' motions for summary judgment and judgment dismissing the complaint, this Court had occasion to describe some of the major background facts. Marco v. Dulles, 177 F.Supp. 533 (S.D.N.Y.1959). As pointed out in that opinion, 177 F.Supp. at 537, it would be a fruitless emprise to assess the multitudinous interlocutory and appellate proceedings with a view to resolving "the question of comparative dilatoriness."

This Court has conferred on numerous occasions with counsel in order to clarify the basic issues of fact and law, to facilitate the introduction of documentary proofs, to stipulate the uncontroverted facts, and to achieve the other objectives of effective pretrial. See Calendar Rules of the U.S.D.C., S.D.N.Y., Rule 13(b), par. III. The result has been a 77-page formal pretrial order (filed March 3, 1967), amplified by Supplemental Pretrial Order # 1 (filed March 16, 1967) and Supplemental Pretrial Memorandum (filed April 3, 1967).

In compliance with the Court's instructions and Calendar Rules of the U.S.D.C., S.D.N.Y., Rule 13(b), par. III(c), counsel have submitted proposed findings of fact and conclusions of law. During the trial the Court, having been furnished with duplicate copies of all exhibits, was able on a session-to-session basis to coordinate close analyses of the documentary evidence with the daily trial testimony. Upon the conclusion of the presentation of evidence, the Court devoted two days to the concluding arguments of counsel which, in accordance with the Court's directive, consisted of detailed expositions of the respective proposed findings and conclusions. This procedure has expedited the rendition of the Court's decision, while the evidence is still fresh in the Court's mind.

This opinion contains the findings and conclusions required by Fed.R.Civ.P. 52(a).

Utilizing the recommended approach to non-jury fact-finding (see United States v. El Paso Gas Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 [1964]; United States v. Forness, 125 F.2d 928, 942–943 [2d Cir. 1942]), the Court has detailed precisely the facts that, upon its study and deliberation, it considers as having been established by the fair preponderance of the credible evidence. Because the findings and conclusions as proposed by respective counsel reflect the Court's suggestions presented in conferences concerning their preparation and format, the Court can selectively accept—after determination of the merit or lack of merit of each proposed finding and conclusion—much of this material, substantially as submitted, though it goes without saying that such acceptance does not represent mechanical adoption.

The pretrial order (p. 1) provides that the pleadings are deemed amended in accordance with the framing of the issues in paragraph 9 of the pretrial order and that the trial shall be based upon said order and upon the pleadings as so amended.

Plaintiff is the administrator of the estate of Harry Marco, deceased, who, at the time of his death, was a citizen of the State of New Jersey.

The only defendants now sued herein are Waddill Catchings, John Foster Dulles, Walter E. Sachs and Sidney J. Weinberg. During the pendency of this action, defendant John Foster Dulles

died, and The Bank of New York (a banking corporation organized under the laws of the State of New York) and Arthur H. Dean, as executors of his estate, were substituted and appeared herein as defendants in his place.

There is complete diversity of citizenship between plaintiff and all the defendants herein.

This is a stockholder's derivative action instituted on March 5, 1958 which plaintiff brought as administrator, derivatively in the right of Blue Ridge Corporation ("Blue Ridge") alleging that it is now Blue Ridge Mutual Fund, Inc. ("Mutual Fund"), and/or Ridge Realization Corporation ("Ridge Realization"), on a cause of action claimed to have belonged originally to Blue Ridge.

The second amended complaint, pleading two causes of action, seeks to impose liability for breach of defendants' fiduciary duty as directors of Blue Ridge. The first claim is predicated upon intentional wrongdoing; the second is based upon negligence.

The pretrial order [p. 75, par. 9(c)] formulates this issue of culpability as follows:

"Did any or all of the individual defendants, Messrs. Dulles, Sachs, Weinberg or Catchings, commit a breach of fiduciary duty, owed as a director of Blue Ridge Corp., by reason of any acts of commission or omission properly complained of and proven herein?"

Independently of the resolution or disposition of the other issues formulated and tried (see pretrial order, pp. 75–76, par. 9), the Court finds and concludes, with respect to the central substantive issue of culpability, that none of the defendants violated any directorial fiduciary duty, intentionally, negligently or otherwise. The Court exonerates the defendants of all of the charges levelled against them by plaintiff. Detailed findings and conclusions concerning this issue are presented in the course of this opinion.

The Court's resolution or disposition of the other issues fomulated and tried

is set forth in the findings and conclusions detailed in this opinion. Prefatory to that recital of the detailed findings and conclusions is the following statement in general terms of the criteria and guidelines used by the Court in appraising the evidence.

The Court has endeavored (1) to place itself in the position of members of the securities business community from 1929 to 1932; (2) to consider a business environment that in a little more than three years had plunged from never-before-attained heights of prosperity to never-before-plummeted depths of depression; (3) to consider the attitudes of businessmen who passed from the euphoria of early 1929 through the shock and gloom of late 1929 and the cautious optimism of 1930 into the panic of 1931; and (4) to judge the transactions in issue in this case by the applicable legal standards but without the benefit of hindsight as to the facts.

The Court is asked by plaintiff, in effect, to substitute its judgment for that of the directors with respect to transactions affecting the internal affairs of Blue Ridge that occurred about thirty-seven years ago. The defendants were not insurers of the successful outcome of their investment decisions. As directors they were, of course, required to perform their duties in accordance with the high standards of fidelity, honesty and prudence applicable to fiduciaries. The *onus probandi* rests upon plaintiff to establish the material facts upon which his accusations of culpability are grounded by a fair preponderence of the credible evidence. Plaintiff has failed in every respect to sustain that burden of proof.

On the other hand, defendants, while not required to establish their freedom from fault, have clearly demonstrated the legality, propriety and validity of their acts and their exercise of reasonableness and prudence with respect to the transactions challenged by plaintiff.

Were the oral and documentary evidence to be considered most liberally from plaintiff's viewpoint, the inferences arguendo favorable to plaintiff's position flowing from the proofs are only equivocal. Even in this state of evidential equipoise, one set of inferences is that the transactions criticized by plaintiff were handled in good faith, with the motive and for the purpose of benefitting Blue Ridge, and in the exercise of business judgment that was reasonable under the circumstances prevailing at the time when the transactions were negotiated and effected. The inferences that plaintiff unsuccessfully attempts to draw turn out to be, in light of the record considered as a whole, nothing more than a skillful assemblage of suspicions, surmises and conjectures.

This case involves vital issues of subjective fact: defendants' motive, intent, business purpose, good faith, credibility, judgment and the exercise of judgment, and the intrinsic fairness to Blue Ridge of the transactions in issue as reconstructed and retrospectively interpreted in their then contemporary setting. With respect to the resolution of such issues oral testimony is especially helpful to the Court. The documentation of the transactions, however sensitively read or closely scrutinized, sheds but little light on those non-objective factors.

The only oral testimony adduced by plaintiff that could possibly be construed as adverse to defendants on any issue of subjective fact was that of Milan D. Popovic. The Court rejects his testimony in this case as unreliable, biased and unimpressive in crucial respects.

On the other hand, defendant Walter E. Sachs, defendant Sidney J. Weinberg, and Clifford F. Stone who testified in open court as to the issues of subjective fact favorably impressed the Court as credible and trustworthy; and the Court accepts their testimony as reliable, plausible and persuasive. Moreover, taking their testimony in conjunction with that of William A. Gill and the documentary proofs relied upon by defendants, the Court accepts their testimony as an integral part of the correct total explanation of the transactions and the motivations behind them, leading to the ultimate finding and conclusion that defendants are not liable herein.

In dismissing the complaint upon the merits, the Court has applied the conventional standards of proof applicable to the generality of civil cases; and, contrary to defendants' submission in their trial brief, the Court has not subjected plaintiff's evidence, such as it is, to any special criteria.

In addition to and in amplification of the findings and conclusions above expressed, the Court now sets forth its detailed findings and conclusions.

Blue Ridge was organized August 12, 1929 as a Delaware Corporation.

The certificate of Blue Ridge authorized it, among other things:

"To underwrite, purchase, acquire, hold, pledge, hypothecate, exchange, sell, deal in and dispose of * * * stocks, bonds and other evidences of indebtedness and obligations of any corporation, association, partnership, syndicate, entity, person or governmental, municipal or public authority, domestic or foreign, and evidences of any interest in respect of any such stocks, bonds and other evidences of indebtedness; * * * and, while the owner or holder of any such, to exercise all the rights, powers and privileges of ownership in respect thereof; and, to the extent now or hereafter permitted by law, to aid by loan, subsidy, guaranty or otherwise those issuing, creating or responsible for any such stocks, bonds or other evidences of indebtedness or obligations or evidences of any interest in respect thereof.

\* \* \* \* \* \*

To make any guaranty respecting stocks, dividends, securities, indebtedness, interest, contracts or other obligations so far as the same may be

permitted to be done by a corporation organized under the laws of Delaware. * * *."

The initial portfolio of Blue Ridge was created in August, 1929. Blue Ridge commenced business with at least $127,500,000 of cash and common stocks.

Blue Ridge acquired large blocks of highly desirable stock as a result of its sponsor organizations' having furnished them at the existing market price.

The directors of Blue Ridge from August, 1929 to December, 1938 were as follows:

| | Date Elected | Date Resigned |
|---|---|---|
| Waddill Catchings | August 17, 1929 | April 21, 1933 |
| John Foster Dulles | August 17, 1929 | April 21, 1933 |
| Clifford F. Stone | August 17, 1929 | Nov. 14, 1935 |
| Sidney J. Weinberg | August 17, 1929 | Nov. 14, 1935 |
| Harrison Williams | August 17, 1929 | April 21, 1933 |
| Walter E. Sachs | May 26, 1930 | April 21, 1933 |
| Floyd B. Odlum | April 21, 1933 | April 18, 1935 |
| L. Boyd Hatch | April 21, 1933 | Nov. 14, 1935 |
| N. Peter Rathvon | April 21, 1933 | Nov. 14, 1935 |
| Melvin E. Sawin | April 21, 1933 | Nov. 14, 1935 |
| C. M. Finney | Nov. 14, 1935 | Dec. 19, 1939 |
| L. E. Kilmarx | Nov. 14, 1935 | Nov. 21, 1935 |
| Thurston P. Blodgett | Nov. 14, 1935 | Nov. 21, 1935 |
| Homer B. Vanderblue | Nov. 14, 1935 | Nov. 21, 1935 |
| H. A. Anderson | Nov. 14, 1935 | Nov. 21, 1935 |
| O. A. Phillip | Nov. 14, 1935 | Nov. 21, 1935 |
| Earle Bailie | Nov. 21, 1935 | Nov. 21, 1938 |
| Waddill Catchings | Nov. 21, 1935 | Dec. 19, 1939 |
| J. Russell Forgan | Nov. 21, 1935 | March 12, 1942 |
| George Murnane | Nov. 21, 1935 | Jan. 22, 1941 |
| Francis F. Randolf | Nov. 21, 1935 | Nov. 21, 1938 |
| Richard Wagner | Dec. 7, 1938 | March 12, 1942 |
| C. A. Johnson | Dec. 7, 1938 | June 11, 1945 |

The following were officers of Blue Ridge at the following times:

| Clifford F. Stone | From August 19, 1929 to April 21, 1933 |
|---|---|
| C. A. H. Narlian | From March 17, 1930 to April 21, 1933 |
| G. W. Schroeder | From August 19, 1929 to April 21, 1933 |
| W. C. Ross | From August 19, 1929 to April 21, 1933 |

———◆———

In the period from 1929–1932:

(a) Shenandoah Corporation owned approximately 80 per cent of the stock of Blue Ridge.

(b) Shenandoah Corporation was organized in July, 1929 under the joint sponsorship of Goldman, Sachs & Co. ("Goldman Sachs"), Goldman Sachs Trading Corporation, and Central States Electric Corporation ("Central States"). Said corporations had charter powers and purposes comparable to those of Blue Ridge.

(c) Central States and Goldman Sachs Trading Corporation each owned approximately 40 per cent of the stock of Shenandoah Corporation.

(d) Harrison Williams was the majority stockholder of Central States.

In December, 1928 Goldman Sachs Trading Corporation was organized. It was managed until 1933 by Goldman

Sachs, a partnership engaged in the securities business.

Goldman Sachs made and, until 1933, continued an investment of approximately $10,000,000 in Goldman Sachs Trading Corporation.

The financial interests of Harrison Williams and Goldman Sachs in Blue Ridge, through their respective interests in Central States, Shenandoah Corporation, and Goldman Sachs Trading Corporation, represented investments of millions of dollars. It was to the financial advantage of Harrison Williams and Goldman Sachs that the business of Blue Ridge be profitable; their business interests and objectives were allied with the best business interests and success of Blue Ridge in its ventures and investments.

From at least August, 1929, Walter E. Sachs and Sidney J. Weinberg were partners in Goldman Sachs. From at least August, 1929, Waddill Catchings was a partner in Goldman Sachs. He ceased to be a partner about May 26, 1930.

Conde Nast Publications, Inc. ("Publications") was a corporation organized in 1922 under the laws of the State of New York. The total outstanding common stock of Publications consisted of 320,000 shares. Its common stock was listed on the New York Stock Exchange.

In 1930 and thereafter, Publications was active in a number of branches of the publishing industry. It published Vogue, Vanity Fair, House & Garden, and The American Golfer, which were nationally known and distributed magazines in the "class" field that appealed to well-to-do and cultivated readers. It owned a large and modern printing plant in Greenwich, Connecticut, where it printed its own magazines and those of other publishers. It manufactured and sold paper dress patterns. It had competent executives and the highly-regarded leadership of Conde Nast. It was prudently managed, and had a history of profitable operations since its first full year of operation in 1923. It did not require financing of any kind in 1930. In 1930, its common stock was selling at eight and a half times estimated earnings; and its dividend represented a five and a half percent return. Its prospects for increased earnings in 1931 were good as the result of the completion of its plant expansion in 1929 and 1930.

The outstanding figure in Publications was Conde Nast, who over the years had developed the business of Publications to the large and successful enterprise it was in 1930. He had an outstanding reputation in publishing circles for his acumen and ability in directing the activities of and in staffing magazines. In 1930, Conde Nast did not desire to give up control of Publications.

In 1930, Conde Nast was indebted for approximately $4,000,000 to various creditors. The collateral securing the indebtedness was about twice the value thereof. Each of such debts was in good standing; the interest thereon was paid; and none of Conde Nast's creditors were pressing for payment. In June 1930, Conde Nast had assets in excess of $10,000,000. By October, 1930, the value of such assets had declined; but Conde Nast's net worth, after giving effect to all liabilities, was over $4,000,000.

Waddill Catchings was a director of Publications from 1927 until October 11, 1933. Sidney J. Weinberg was a director of Publications from December, 1930 through January, 1934.

A certificate bearing number NYCO 11015 representing 35 shares of the common stock of Blue Ridge was issued in the name of Harry Marco and dated April 21, 1930.

Said shares were not transferred out of the name of Harry Marco on the books of Blue Ridge or its transfer agent.

The certificate of incorporation of Blue Ridge, from at least the time that Harry Marco became a stockholder until at least 1936, provided:

"A director of the corporation shall not, in the absence of fraud, be dis-

qualified by his office from dealing or contracting with the corporation either as vendor, purchaser or otherwise, nor in the absence of fraud, shall any transaction or contract of the corporation be void or voidable or affected by reason of the fact that any director or any firm of which any director is a member, or any corporation of which the director is an officer, director or stockholder is in any way interested in such transaction or contract, provided that, at the meeting of the Board of Directors or of a committee thereof having authority in the premises to authorize or confirm said contract or transaction, the interest of such director, firm or corporation is disclosed or may be known, and there shall be present a quorum of directors or of the directors constituting such committee not so interested or connected, and such contract or transaction shall be approved by a majority of such quorum, which majority shall consist of directors not so interested or connected. Nor shall such contract or transaction be void or voidable or affected by reason of the fact that the vote of such director or directors, who have or may have interests therein which are or might be adverse to the interest of the corporation, shall have been necessary to obligate the corporation upon such contract or transaction, nor shall any director or directors having such adverse interests be liable to the corporation or to any stockholder or creditor thereof, or to any other person, for any loss incurred by it under or by reason of any such contract or transaction nor shall any such director or directors be accountable for any gains or profits realized thereon; always provided, however, that such contract or transaction shall, at the time it was entered into, have been a reasonable one to have been entered into and shall have been upon terms that at the time were fair.

Any contract, transaction or act of the corporation or of the Board of Directors or of the Executive Committee which shall be ratified by a majority in interest of a quorum of the stockholders of the corporation having voting power at any annual meeting or any special meeting called for such purpose shall be as valid and as binding as though ratified by every stockholder of the corporation, provided, however, that any failure of .the stockholders to approve or ratify such contract, transaction or act, when and if submitted, shall not be deemed in any way to invalidate the same or to deprive the corporation, its directors or officers, of their right to proceed with such contract, transaction or action."

In October, 1929, a business and market depression began which proved unpredictably to be of extreme severity and length. Prices of securities declined; and the values of portfolios decreased. In October, 1930, experienced business and financial leaders generally believed that the depression would not be protracted, and business and market conditions were viewed with at least cautious optimism.

In the fall of 1930, Conde Nast determined to consolidate his indebtedness with one creditor and sought an arrangement with Blue Ridge in connection therewith. He proposed to Waddill Catchings, then chairman of the Board of Blue Ridge, that in consideration of the benefits set forth hereafter Blue Ridge undertake a commitment to The .Chase National Bank ("the Chase Bank") in relation to the loan mentioned below.

The directors of Blue Ridge believed in good faith and it was their judgment which was reasonably held by them that the bottom of the market and depression were near in October, 1930. They believed it was then opportune to invest and seek investments. Blue Ridge made purchases of securities, as shown by its treasurer's reports. It was the economic program and policy

of Blue Ridge and its board of directors at the time to remain in a fully invested position rather than liquidating. The directors were motivated by the expectation that conditions would get better and that Blue Ridge would derive profit from this policy.

It was Catchings' plan to acquire at least a 20 per cent interest in Publications and possibly an interest in excess of 50 per cent. 5000 shares would be bought in the market; Blue Ridge would then be entitled to an option on an additional 5000 shares. Blue Ridge was to receive 10,000 shares for agreeing conditionally to acquire the 160,000 shares on December 31, 1931, and was to have an option on 40,000 additional shares. Together, this would enable Blue Ridge to acquire 60,000 shares or 20 per cent of Publications for an initial cash outlay of only approximately $180,000 or less. In the event that Blue Ridge became a purchaser of the 160,000 shares, it would own 10,000 additional shares (5000 bought in the market and 5000 under option) and thereby have more than 50 per cent of the outstanding stock at about $10 per share under the October, 1930, market price.

Catchings brought to Blue Ridge the opportunity to make an investment in Publications because he believed it would give Blue Ridge a great opportunity to make a good investment in a company which had a good record and a promising future. The record of success of Publications had been extraordinarily good. It had three fine well-established magazines, a magnificent printing establishment near Greenwich which had no parallel in the United States and possibly in the world. It was the expectation of Catchings that its stock would advance substantially.

Said arrangement, as concluded through various agreements, included the following:

(a) A loan from the Chase Bank in the amount of $4,000,000, due December 31, 1931, secured by 160,000 shares of the stock of Publications (an amount sufficient to give control) made to The Vogue Company ("Vogue") wholly owned by Conde Nast, and the money so lent to be used to pay the debts of Conde Nast, his companies, and associates whose indebtedness Conde Nast had personally guaranteed.

(b) An agreement that, if said loan were not paid on the due date, Blue Ridge would purchase from the Chase Bank the 160,000 shares of stock of Publications for $4,000,000 plus any unpaid interest on the loan.

(c) An agreement that, if said loan were paid on the due date, Conde Nast and his companies would deliver to Blue Ridge without further consideration 10,000 shares of the stock of Publications and would grant Blue Ridge an option to buy 40,000 additional shares of the stock of Publications for a price of $35 a share.

On or about October 9, 1930, Waddill Catchings, on behalf of Blue Ridge, entered into an agreement with Publications undertaking to purchase up to 5,000 shares of the common stock of Publications, if available, on the New York Stock Exchange within the next six months, at $36 per share or better. In consideration thereof, Publications agreed to sell to Blue Ridge at any time within one year from said date 5,000 shares of the common stock of Publications at the following prices: $40 per share, up to the number of shares equaling the number of shares which Blue Ridge had purchased at $36 per share or less; and $42 per share, up to the number of shares which represented the difference between the number purchased by Blue Ridge at $36 or better and 5,000 shares. Said agreement further provided that, if and to the extent that Blue Ridge should fail to exercise either of the above options, Publications agreed to sell to Blue Ridge, during the period from October 9, 1931 to October 9, 1932, at $45 per share, the number of shares necessary to make the total purchases by Blue Ridge from Publications 5,000 shares; and all options granted under said agreement would expire at October 9, 1932.

The arrangement to buy 5,000 shares of Publications did not oblige Blue Ridge to do so, but if Blue Ridge did buy the shares, it expected to exercise its option to acquire another 5,000 shares. This option was at prices which favored acquiring the shares in the market at or less than the then price of $36 and was thus a market deflationary incentive. It was not a plan for bolstering or inflating the market price.

Pursuant to the above-described agreements, Blue Ridge between October 6, 1930 and April 10, 1931 purchased 5,000 shares of Publications on the New York Stock Exchange at prices ranging between 36 and 31-7/8, for a total cost of $172,750; and Blue Ridge did not exercise any of the said options.

On or about October 24, 1930, Conde Nast, his personal companies and associates (whose indebtedness he had guaranteed) were indebted as follows, on collateralized loans:

| | |
|---|---|
| Chase National Bank | $2,382,156.28 |
| Goldman Sachs | 1,083,268.96 |
| Guaranty Trust Company | 240,082.18 |
| Broadway Plaza Trust Company | 150,550.00 |

Blue Ridge evaluated on its merits each stock purchase that it made. It had an efficient statistical organization that investigated every purchase situation; and reports were prepared of every security purchased for the information of the board of directors. The officers of Blue Ridge reviewed market situations each day, and shares were bought on the basis of what was available.

The purchase by Blue Ridge of 5,000 shares of stock of Conde Nast Publications was brought before the board in the treasurer's report as a completed transaction. There is no evidence of an improper motive of the Blue Ridge directors in ratifying these purchases; they were within the powers and purposes of Blue Ridge and were made at the prevailing market price. The purchases were made for proper business purposes and with the motive to benefit Blue Ridge.

On October 24, 1930, the Chase Bank lent $4,000,000 to Vogue and obtained its promissory note due December 31, 1931, endorsed by Conde Nast and his personal companies and collaterally secured by the pledge of 160,000 shares of the stock of Publications, pursuant to the arrangement referred to above.

The proceeds of the $4,000,000 loan made by the Chase Bank to Vogue were used by Vogue to pay the indebtedness of Conde Nast, his companies and certain associates, as previously described; and the balance of $143,942.58 was retained by Vogue.

Vogue instructed the Chase Bank to pay to Goldman Sachs:

(a) for the account of Conde Nast, Inc., a personal company of Conde Nast, $327,999.02 in payment of its indebtedness to Goldman Sachs, against surrender and delivery by Goldman Sachs to Vogue of securities held as collateral with the market value of $792,969.00;

(b) for the account of The Montrose Development Corporation, a personal company of Conde Nast, $284,089.81 in payment of its indebtedness to Goldman Sachs, against surrender and delivery by Goldman Sachs to Vogue of securities held as collateral with the market value of $473,500.00;

(c) for the account of Max Rosett, $471,180.13 in payment of his indebtedness to Goldman Sachs guaranteed by Conde Nast, against surrender and delivery by Goldman Sachs to Vogue of securities held as collateral with the market value of $622,800.00.

The total amount of all said indebtedness was $1,083,268.96. The total market value of the collateral held as security and delivered by Goldman Sachs was at least $1,889,269. The collateral held as security by Goldman Sachs was about 171 percent of the principal amount of the said total indebtedness.

Goldman Sachs' status as a creditor of Conde Nast was known to the board of directors of Blue Ridge at the time

it approved the transaction of October 24, 1930. Walter E. Sachs did not participate in the vote of the directors on October 29, 1930, which approved the transaction because his firm was a creditor of Conde Nast. Sidney J. Weinberg, another partner of Goldman Sachs, was absent and also did not vote on the transaction.

Blue Ridge's net book cost of assets of its own portfolio at that time was in the amount of $141,000,000; and its market value on October 24, 1930, was over $113,000,000.

The value on October 24, 1930 of 160,000 shares of the stock of Publications was at least $5,760,000 plus a premium of undetermined amount for the value of corporate control accompanying the ownership of such a block of stock.

■ The "investment value" of the stock of Publications in October, 1930 is the value of the stock to a person acquiring or holding it as an investment, apart from such value as ownership of the stock might give in facilitating or obtaining control of Publications. The "control value" of the stock was greater than the investment value.

A careful investigation was made of the business of Publications, its earnings and prospects. Waddill Catchings was familiar with the history, business, results of operations and values of Publications. He was also familiar with the financial affairs, assets and liabilities of Conde Nast and his personal companies. These were discussed and considered by the officers of Blue Ridge and by and with Harrison Williams and Clifford F. Stone.

Harrison Williams testified by deposition that he had discussed the October, 1930 transaction with the directors of Blue Ridge before he and they approved it as to the advisability of Blue Ridge's entering into the transaction. Williams, Catchings and the board of directors of Blue Ridge looked into the transaction exhaustively before it was entered into, just as Blue Ridge investi-

gated any other big situation it might wish to invest in. Williams was told the reasons for the transaction. He also knew that Conde Nast was indebted to Goldman Sachs at the time. There is no countervailing evidence. The Court credits this testimony.

■ The directors of Blue Ridge and the staff made a thorough investigation of the complete transaction of October 1930 in all its phases and in good faith exercised informed and reasonable judgment in approving it, under the facts and circumstances prevailing at the time. Their motivation was an expectation of profit to be derived thereby by Blue Ridge.

At a meeting held on October 29, 1930 (the first board meeting after October 24, 1930), the directors of Blue Ridge (Walter E. Sachs not voting and Sidney J. Weinberg absent) considered and approved the arrangement of October 24, 1930 set forth above; said arrangement was fully described in the minutes of said meeting.

The arrangement of October 24, 1930 was considered and approved by the board of directors of Blue Ridge in the honest exercise of informed reasonable business judgment in the light of the circumstances.

■ None of the individual defendants derived any unfair benefit or personal advantages from the said arrangement or its performance; and said arrangement and its performance were fair to Blue Ridge.

Stone, Weinberg, Williams, Catchings and Sachs testified that they and the board of Blue Ridge in good faith believed that the arrangements of October, 1930 represented an attractive opportunity for a profitable investment for Blue Ridge at a minor cash outlay at the inception thereof. The total amount involved was a small fraction of the total investments of Blue Ridge in all securities, which on October 24, 1930 at market values amounted to over $113,-000,000. The Court accepts their testimony as credible and reasonable and as

explanatory of their motive and intent in having Blue Ridge enter into the arrangement.

Conde Nast was solvent in October, 1930. None of his creditors was pressing. He expected to be able to pay the Vogue note to the Chase Bank at maturity. Catchings knew Nast's financial condition and he expected that the note would be paid. Nast's debts were very well collateralized.

■ The Court finds no basis for any imputations against Goldman Sachs or any of its members. The October, 1930 transaction resulted in the payment of debts owed to Goldman Sachs, but these debts were collateralized at substantially more than 100 per cent or in excess of the particular requirements of each loan. Interest on them was being paid and Goldman Sachs felt no insecurity about them.

Goldman Sachs, which was interested in the October, 1930 transaction, was known to the directors of Blue Ridge; and those directors who were also partners in Goldman Sachs did not participate in or vote on the transaction. There is no showing that Goldman Sachs or any of its members derived or sought to derive any unfair advantage from the transactions at issue. There is no showing that Goldman Sachs or its members derived or sought to derive any benefits from the transactions at issue that would outweigh the disadvantages that would accrue to them from losses suffered by Blue Ridge.

It is of no significance that Conde Nast may have lost money investing in securities or companies sponsored by Goldman Sachs. Goldman Sachs or its members were not guarantors of the success of those ventures. Plaintiff has shown no connection between them and the transactions here complained of.

■ The contention of plaintiff that Blue Ridge was caused to enter into a transaction, the object of which was to maintain the price of Publications stock on the stock exchange to deter sales by creditors and to make the $4,000,000

loan feasible, has not been supported by a fair preponderance of the credible evidence. The defendants have denied that these were the motive and intent of the acquisition of 5,000 shares of Conde Nast Publications, Inc. in the market. They presented testimony that the purpose was to make a desirable investment in a well regarded enterprise under circumstances which would lead to acquiring an option on a further 5,000 shares at attractive prices. The Court accepts the testimony of defendants as credible and the purpose ascribed as proper and reasonable and in the course of the business of Blue Ridge at the time.

■ The Court finds that none of the defendants was motivated by considerations adverse to the best business interests of Blue Ridge, such as friendship for and partiality towards Conde Nast or any person who was a friend of Conde Nast. Plaintiff has produced no evidence beyond the innocent facts that Catchings and Williams were friends of Nast. The evidence, on the contrary, shows that the directors of Blue Ridge considered matters connected with Conde Nast to be no different from matters connected with other investments of Blue Ridge.

On April 15, 1931, at their regular annual meeting, the stockholders of Blue Ridge—upon the submission by the chairman to the meeting of the minute book of the corporation containing, among other things, the minutes setting forth or describing the contracts, acts and proceedings of the board of directors and of the officers of the corporation since the prior annual meeting of stockholders on April 16, 1930 and after examination of the minute book—voted unanimously that all of the contracts, transactions, matters and things set forth or referred to therein, be and they thereby were in all respects approved, ratified and confirmed. The said minutes included the minutes of the board of directors of October 29, 1930 which reflected the arrangement of October 24, 1930.

Ninety-two per cent (6,924,670 shares) of the outstanding shares of common stock (7,450,000 shares) were represented in person or by proxy at the April 15, 1931 stockholders' meeting. Of the said 92 per cent that were so present, 100 per cent voted in favor of ratification of all acts and proceedings of the officers and directors for the year prior to April 15, 1931, which includes *inter alia* the 5,000 shares matter, the arrangements of October 24, 1930 and the releases of securities to the extent that they were released.

■ There is no proof that the release of collateral agreed to be pledged to secure Blue Ridge as a purchaser of 160,000 shares of Conde Nast Publications, Inc. injured Blue Ridge. The circumstances that the parties initially agreed that such collateral should be pledged to secure Blue Ridge and that the parties changed their minds does not establish by a fair proponderance of credible evidence that such release was wrongful or wasteful of the assets of Blue Ridge. The collateral was never resorted to; and the release of part thereof is of no significance in this case.

There is no credible proof that any of the directors, other than the director Catchings, participated therein. The proof is that Catchings was authorized to exercise his judgment within the limits of the agreement of October 24, 1930.

Plaintiff failed to sustain his burden of proof on this contention. The action of the officers of Blue Ridge in consenting to the release of collateral did not proceed from any improper motive and represented an exercise of judgment in the circumstances of the time which is supportable discretion in the management of the business affairs of Blue Ridge.

The business and market situation, which showed improvement toward the end of 1930 and the beginning of 1931, suffered serious reverses in the latter half of 1931. The failure of the Kreditanstalt, the principal Austrian bank, in May, 1931 and Great Britain's abandonment of the gold standard in September, 1931 had a severe adverse effect on the American financial and business community, including the securities markets toward the end of 1931. Many businesses failed; many banks closed their doors; stock prices declined; and the number of the unemployed increased. Creditors' remedies became less valuable; property sold under foreclosure yielded only a small fraction of its worth.

By the end of December, 1931, economic and market conditions had unexpectedly changed radically and were materially worse than conditions in 1930. Conditions of panic prevailed at the end of 1931. A downward spiral of the economy continued into the late spring of 1932.

■ In these conditions, Catchings arranged with Conde Nast to sell the 160,000 shares of Publications stock to him for $4,800,000. The directors of Blue Ridge in good faith believed that the best way to have the note therefor paid and to realize what Blue Ridge was entitled to under the Conde Nast transaction would be to lodge the stock in the hands of Nast, subject to a claim on it so that his interest in furthering and maximizing the profits and progress of the company then would be best assured.

The resale of the 160,000 shares of Publications stock to Nast was considered to be the best alternative for Blue Ridge for the further reason that the stock could not be sold elsewhere at the time; and because, in view of the panic in the market, no one in the investment field would buy it without Nast's management. There was no reasonable alternative to the sale to Nast in the judgment of the directors; and none has been demonstrated by evidence.

The directors of Blue Ridge in good faith believed that conditions would eventually improve. Catchings thought that the note for $4,800,000 would be paid to Blue Ridge. None of Nast's

creditors were pressing him and Nast's balance sheet indicated to Catchings and Narlian that Nast was virtually solvent, after giving effect to the face amount of the note and considering the intrinsic value believed to be contained in his collateral. Nast's confidential adviser, MacDonald De Witt, believed that in February, 1932 Nast was in a position to pay his debts. The directors of Blue Ridge had faith in Nast's ability to recover financially and had confidence in the future of the Publications company.

On December 31, 1931 Vogue paid the interest on its note dated October 24, 1930, but did not pay the principal amount thereof. Blue Ridge paid the principal amount thereof to the Chase Bank and bought the 160,000 shares of stock of Publications, in accordance with its agreement of October 24, 1930.

On January 2, 1932 the officers of Blue Ridge sold the 160,000 shares of stock of Publications to Conde Nast for $4,800,000 and received his collateralized demand note therefor. The collateral was appraised by Blue Ridge at $2,100,-000 using market prices, and by Mac-Donald De Witt, counsel and a director of Publications, using, in his opinion, what represented fair valuation of the stock of Publications, at $4,258,350.

Conde Nast was regarded by the officers and directors of Blue Ridge as a debtor of good moral risk; and they had confidence in his ability to rebuild and improve his financial standing with a change in the outlook for the economy which was expected. Publications continued at the time to be held in regard by the officers and directors of Blue Ridge as among the leaders of the fashion magazines in the publications field and as a potential profit-maker.

Nast's greatest asset was his ability as a publisher. In December, 1931, it was the judgment and belief in good faith of the directors of Blue Ridge that Publications could come back to its former position, financially and business-wise, if Nast were to remain in control and that it was to Blue Ridge's interest that Nast should continue to do so.

The price at which Blue Ridge sold the stock of Publications to Conde Nast on January 2, 1932 was substantially above the market price.

By reason of the business and market conditions prevailing in 1932 and 1933, Blue Ridge had no reasonable course open to it other than to refrain from selling out the collateral held as security therefor.

Blue Ridge recorded on its books, in or about December 31, 1931 or January 1 or 2, 1932, a profit of $796,800 on the sale of 160,000 shares of stock of Publications; and reported said profit on its federal income tax return. It was allowed such profit on the federal tax audit for the year 1932.

On February 10, 1932, at their annual meeting, the stockholders of Blue Ridge, upon the submission by the chairman to the meeting of the minute book of the corporation containing, among other things, the minutes setting forth or describing the contracts, acts and proceedings of the board of directors and of the officers of the corporation since the last annual meeting of stockholders on April 15, 1931, voted unanimously that all of the contracts, transactions, matters and things set forth or referred to therein, be and they thereby were in all respects approved, ratified and confirmed. The said minutes included the minutes of the board of directors of January 25, 1932, which contained approval of the treasurer's report dated January 22, 1932 and the 1931 annual stockholders' report reflecting the transactions described above.

On April 27, 1932, the board of directors of Blue Ridge considered and approved the transaction made by the officers involving the purchase of the 160,000 shares of stock of Publications and the sale thereof to Conde Nast for $4,800,000, represented by his collateralized demand note.

The transaction which Blue Ridge entered into on January 2, 1932, as described above, was approved by the board of directors in the exercise of honest, informed, reasonable business judgment

under the circumstances and business and market conditions then prevailing and anticipated.

From time to time and in accordance with recommended accounting practice, Blue Ridge revalued on its books and records the collateral supporting said note of Conde Nast on the basis of then current market prices and carried said note at the estimated fair value of the collateral.

Blue Ridge set up on its books of account, on or about January 2, 1932, a reserve in respect to the note of Conde Nast and thereafter did not, and did not purport to, record any reduction of the liability thereon or any loss thereon or in respect to the arrangement of October 24, 1930 asserted herein, nor was said reserve a reduction of the income of Blue Ridge.

The board of directors of Blue Ridge at its meeting held on January 19, 1933, as set forth in the minutes of said meeting, recommended that the book value of the investments of Blue Ridge be adjusted to market prices or, where there was no market, to estimated fair value as of December 31, 1932 as shown in the adjusted balance sheet of Blue Ridge as of that date, which had been approved by the board, and that the certificate of incorporation be amended so that the earned surplus and net profits of Blue Ridge and their availability for dividends should thereafter be computed on the basis of the revaluation of investments shown in such adjusted balance sheet and on the basis of results of operations subsequent to December 31, 1932. Said investments so revalued included the Conde Nast note.

At a special meeting of the stockholders of Blue Ridge held on February 8, 1933, the recommendations contained in the minutes of the board of directors set forth in the preceding paragraph were submitted to the stockholders of Blue Ridge. Out of a total of 693,912 shares of preference stock voted in person or by proxy in favor of the adoption of said recommendations and 100 shares of preference stock voted against the adoption; and 6,900,635 shares of common stock entitled to vote at the meeting voted, in person or by proxy, in favor of such adoption and no shares of common stock voted against such adoption. The stockholders resolved that the revaluation of investments reflected in the adjusted balance sheet of Blue Ridge, as of December 31, 1932, including the revaluation of the Conde Nast note to estimated fair value as of December 31, 1932, be made effective for all corporate purposes.

On February 8, 1933, at their annual meeting, the stockholders of Blue Ridge, upon the submission by the chairman to the meeting of the minute book of the corporation containing, among other things, the minutes setting forth or describing the contracts, acts and proceedings of the board of directors and of the officers of the corporation since the last annual meeting of stockholders on February 10, 1932, including the minutes of the directors' approval of the purchase and subsequent sale of the 160,000 shares of Publications and the acceptance of the collateralized note of Conde Nast therefor, and including the minutes of the directors in relation to the adjusted balance sheet of December 31, 1932 and the revaluation of investments reflected thereon, voted unanimously that all of the contracts, transactions, matters and things set forth or referred to therein, be and they thereby were in all respects approved, ratified and confirmed.

In April, 1933, control of Blue Ridge passed to Atlas Corporation, a corporation headed by Floyd Odlum. A new board of six directors was elected, which included Messrs. Weinberg and Stone who continued as directors. Five of the six members of said board are not defendants herein. At the same time, Atlas acquired control of Shenandoah and Goldman Sachs Trading Corp.

On January 31, 1934, pursuant to authority of the then board of directors given on January 11, 1934, Blue Ridge sold and assigned to The Vogue Studios, Inc. ("Vogue Studios") all its right, title and interest to the note of Conde Nast

dated January 2, 1932; and there were transferred to Vogue Studios all the right, title and interest to the collateral held by Blue Ridge for such note. Blue Ridge received $1,000,000 in cash from Vogue Studios and 19,000 shares of the stock of Publications therefor. The majority of the board of directors of Blue Ridge which approved and voted for such sale are not defendants in this case.

The determination to sell the Conde Nast note at a loss to Blue Ridge occurred (when the transaction described in the preceding paragraph was made by Blue Ridge in January, 1934) while Blue Ridge was under the control of Atlas Corporation.

The transaction which Blue Ridge entered into on January 31, 1934, as described above, was effected for valid business reasons and purposes and in the exercise of reasonable, honest business judgment in consideration of existing business and market conditions and of estimates and forecasts of future business and market conditions including the purpose to utilize the funds so derived in other corporate ventures.

None of the individual defendants derived any personal benefit or advantage from the transactions described above.

On April 18, 1934, at their annual meeting, the stockholders of Blue Ridge, upon the submission by the chairman to the meeting of the minute book of the corporation containing, among other things, the minutes setting forth or describing the contracts, acts and proceedings of the board of directors and of the officers of the corporation since the last annual meeting of stockholders on February 8, 1933, including the transaction on January 31, 1934 described above, voted unanimously that all of the contracts, transactions, matters and things set forth or referred to therein, be and they thereby were in all respects approved, ratified and confirmed.

 The Court rejects plaintiff's claim that the ratifications by the stockholders of Blue Ridge are ineffectual on the asserted ground that the dominant interests in Blue Ridge were purporting to ratify their own *ultra vires* acts.

The Court rejects plaintiff's claim that the transactions of 1930 through 1932 were *ultra vires*. Blue Ridge's certificate of incorporation grants the corporation broad and varied powers. The challenged transactions come within them.

 In any event, the transactions of 1930 through 1932 are, as a matter of law, of the character which, even if they had been *ultra vires*, permits ratification.

The Court finds that the transactions of 1930 through 1932 were duly and effectively ratified. The proxy statements sent to the stockholders showed that all the acts and transactions of the officers and directors of the corporation since the previous stockholders' meeting were being proposed for ratification. The minutes of the stockholders' meetings, which are not impugned, showed that all the acts and transactions of the officers and directors were spread before the stockholders, and that the stockholders unanimously ratified the acts of the officers and directors in connection with the transactions of October, 1930; December, 1931; January, 1932; and January, 1934.

The minutes of the stockholders' meetings show that a large number of shares in addition to the shares owned by Shenandoah Corporation were voted unanimously at the stockholders' meetings of Blue Ridge. There is no evidence that the Harry Marco of 34th Street, New York, New York, to whom a certificate for 35 shares of stock of Blue Ridge had been issued in April, 1930, had dissented from any of the acts of the stockholders in ratifying the acts and transactions of the defendants.

There is no evidence that defendants withheld or caused the withholding of material information from, or practiced any fraud upon, the stockholders of Blue Ridge at the annual meetings of 1931, 1932, 1933 and 1934.

All recordable aspects of each of the transactions on which plaintiff asserts

claims herein were fully set forth and revealed on the books, records, minutes, contracts and reports of Blue Ridge.

A stockholder's derivative action on behalf of Blue Ridge was commenced in the Supreme Court, Kings County, by Harry Marco in September, 1936 against the defendants herein and others ("Marco v. Sachs").

Prior to commencing Marco v. Sachs, Harry Marco made no demand upon the directors or stockholders of Blue Ridge that they take any action with regard to any of the acts and transactions of the officers or directors of Blue Ridge during the period from 1929 through 1934.

When Marco v. Sachs was commenced, only one of the six members of the 1930–32 board of directors of Blue Ridge, i. e., Catchings, had participated in the $4,-000,000 loan of 1930 and the agreement of Blue Ridge connected therewith or the $4,800,000 Conde Nast note transaction of 1932.

No understanding, agreement, or arrangement of any kind was proved or existed between the directors of Blue Ridge in office in 1936 and the directors in office from 1929 to 1934 that the directors in 1936 would not bring an action against or seek redress from the directors in office from 1929 to 1934 for any wrongs allegedly done to Blue Ridge at any time during that period.

The complaint in Marco v. Sachs charged the defendants with wrongdoing in acquiring the note of Conde Nast and in failing to require the obligor on the note to give additional collateral or to pay the note and in failing to sell the collateral to curtail loss by reason of shrinkage of said collateral.

The complaint in Marco v. Sachs did not charge the defendants with wrongdoing with regard to (a) the arrangement of October 24, 1930, as previously described above; (b) the release in 1930 and 1931 to Vogue of collateral held by the Chase Bank as security for its note; and (c) the sale of the note of Conde Nast in January, 1934, as previously described above.

Blue Ridge was served with process in Marco v. Sachs on February 4, 1937. Thereafter the action remained dormant until it abated in 1942.

Mr. Bailie, the president and a director of Blue Ridge, suggested the employment of Cravath, deGersdorff, Swaine & Wood, Esqs. ("the Cravath firm") as special counsel for Blue Ridge in Marco v. Sachs.

On March 10, 1937, Blue Ridge retained the Cravath firm in Marco v. Sachs. The Cravath firm drafted motion papers to dismiss the action on jurisdictional grounds. No such motion was made. On March 20, 1937, Messrs. Finney and Kilmarx, officers of Blue Ridge, informed the Cravath firm that Blue Ridge did not wish to appear in the action.

Blue Ridge, in 1937, considered its appearance inadvisable in Marco v. Sachs as possibly involving Blue Ridge in problems of jurisdiction and taxation. Blue Ridge at the time had its principal office in New Jersey and was concerned about possible adverse tax consequences in the State of New York if Blue Ridge admitted, by an appearance in Marco v. Sachs, that it was subject to the jurisdiction of the New York courts.

The unwillingness of Blue Ridge in 1937 to appear in the action of Marco v. Sachs was not attributable to any belief on the part of its officers and directors that that action had any merit.

On or about March 22, 1938, Joseph Pellegrino, a stockholder of Blue Ridge, commenced a stockholder's derivative action in Supreme Court, New York County, against Messrs. Catchings and Weinberg by serving them with process. The complaint also named as defendants Messrs. Dulles and Williams, among others, but they were not served with process and did not appear.

The complaint in the *Pellegrino* case alleged three causes of action against the former directors of Blue Ridge:

First, negligence generally in the conduct of the affairs of Blue Ridge and with regard to "the purchase of certain

unlisted securities for and on behalf of Blue Ridge."

Second, negligence generally in the conduct of the affairs of Blue Ridge and with regard to "the making of a loan on the security of a certain promissory note and securities, the obligor being an officer of Blue Ridge."

Third, that defendants authorized the issuance of the common stock of Blue Ridge for a consideration less than the par value of its stock.

Defendants Weinberg and Catchings moved to dismiss the complaint in the *Pellegrino* action because it failed to state a cause of action, because plaintiff lacked capacity to sue, and because of the bar of limitation.

On or about May 26, 1938, plaintiff in the *Pellegrino* action served an amended complaint. The amended complaint in the *Pellegrino* action amplified the allegations of the original complaint and did not allege that the obligor on the promissory note referred to in the second cause of action was an officer of Blue Ridge.

On or about July 7, 1938, defendants Weinberg and Catchings moved to dismiss the amended complaint in the *Pellegrino* action because it failed to state a cause of action; because plaintiff lacked capacity to sue; and because of the bar of limitation. The plaintiff in said action stipulated to discontinue the suit before the motion was heard and decided.

Plaintiff has failed to sustain his burden of proof that demand upon the directors of Blue Ridge in 1936 would have been futile. There is no showing that the directors in 1936 had forsaken or would forsake their fiduciary duties to Blue Ridge by arbitrarily rejecting or ignoring claims which Blue Ridge might then have had against its former directors.

Plaintiff's proof rests upon surmises unsupported by facts. Only one of the directors in 1936—Catchings—had participated in the transactions of 1930 through 1932. The other directors—Messrs. Finney, Bailie, Forgan, Murnane

and Randolph—were not shown by the fair preponderance of the credible evidence to have been under the domination or control of any person who might be hostile to the prosecution of an action based on these transactions.

That certain of these directors may have been elected to the board by holders of large blocks of stock does not establish either as a matter of fact or as a matter of law that these directors were subservient in the performance of their duties or would be heedless of the interests of Blue Ridge.

The directors of Blue Ridge in 1936, other than Catchings, were Earle Bailie, Sr., an officer of Tri-Continental and Selected Industries and a partner in J. & W. Seligman; J. Russell Forgan, a partner in Glore, Forgan & Co., who had no connection with any company with which Harrison Williams was affiliated; George Murnane, a director of various companies, none of which was affiliated with Blue Ridge; Francis F. Randolph, a partner of J. & W. Seligman and an officer of Tri-Continental Corporation; and Clinton M. Finney, who was brought into the Conde Nast picture to observe the performance of the obligations due to Blue Ridge.

The failure to make a demand in 1936 is not excused by reason of any acts of the directors in 1938. The Court is unable to find from the directors' action in 1938 what their action would have been in 1936. Nor can it reasonably be found that the 1938 actions of the directors evidence bias and unwillingness to protect the interests of Blue Ridge and that such attitude on the part of the directors also existed in 1936, because the claims set forth in the complaints in the *Pellegrino* case refer to matters significantly different from the claims set forth in the 1936 complaint in the *Marco* case and because the defense of limitations set forth by defendants in the *Pellegrino* case was a substantial defense.

Harry Marco died intestate on or about July 8, 1942; and Marco v. Sachs abated.

On or about November 24, 1943, letters of administration upon the estate of

Harry Marco were granted by the Atlantic County Surrogate's Court of the State of New Jersey to Ida Marco, who qualified as administratrix.

Blue Ridge stock certificate NYCO 11015 never came into the possession of Ida Marco. Ida Marco had temporary custody of said certificate in the following circumstances: At a time when Ida Marco was administratrix of the estate of Harry Marco, she endorsed said certificate in blank by affixing her signature to a statement on the reverse side of it that the registered owner does "hereby sell, assign and transfer * * * the Capital Stock represented by the within Certificate." After so endorsing said certificate, she never had possession or custody thereof.

The representatives of Harry Marco have never accounted in any court for any estate of said decedent.

On or about June 27, 1944, ancillary letters of administration were issued to Ida Marco by the Surrogate's Court of the State of New York, County of Kings. Ida Marco qualified as ancillary administratrix of the estate of Harry Marco, deceased.

On or about October 16, 1944, Marco v. Sachs was revived and continued by Ida Marco, as such ancillary administratrix.

Blue Ridge in 1946 brought, and in 1957 discontinued, an action in this Court against Harrison Williams (Civ.No.35–523). At no time material herein did Blue Ridge sue Messrs. Catchings, Dulles, or Weinberg or assert against them the claims made herein.

An amended complaint in Marco v. Sachs was served in 1946 and a second amended complaint in 1947.

Prior to 1946 more than ten years had elapsed on all grounds of liability not set forth in the original complaint in Marco v. Sachs.

The amended and second amended complaint in Marco v. Sachs alleged—as an excuse for plaintiff's failure to make demand on the board of directors of Blue Ridge before commencing Marco v. Sachs—an agreement or understanding between the board of directors in office in 1936 and their predecessors that the board in office in 1936 would not take action against their predecessors for wrongs done to Blue Ridge.

On or before April 24, 1950, Central States, a Virginia corporation, was in reorganization under Chapter X of the Bankruptcy Act in a proceeding then pending in the United States District Court for the Eastern District of Virginia.

Central States held a substantial stock interest in Blue Ridge in 1950. As part of the reorganization plan of Central States, arrangements were made and effected, on or about June 15, 1951, for the sale, assignment and transfer to Ridge Realization of any and all claims, demands, rights, monies, judgments, awards, title and interest of every nature whatsoever which Blue Ridge had in Marco v. Sachs and for the subsequent transfer of the business of Blue Ridge through merger of Blue Ridge into Mutual Fund.

Mutual Fund was organized in 1951 as a Delaware corporation.

Ridge Realization was organized in 1951 as a Delaware corporation.

The assignment from Blue Ridge to Ridge Realization mentioned above included the following provision:

"3. [Ridge] Realization will pay and assume all expenses, costs and counsel fees heretofore incurred and unpaid in the prosecution of such action [Marco v. Sachs] and further assumes all obligations to pay such further expenses, costs and counsel fees as may be incurred in the further prosecution of such action as if Blue Ridge had remained a party to such action. Realization also assumes all obligations to pay such allowances, if any, as the court may make in such action."

On or about June 15, 1951, Ridge Realization issued and delivered to Blue Ridge 7,422,483 shares of common stock of Ridge Realization. Blue Ridge declared said stock as a dividend to its stockholders, one share of Ridge Realiza-

tion for each share of Blue Ridge outstanding.

On June 28, 1951 Blue Ridge merged into Mutual Fund. The transactions set forth in the preceding paragraph were effected prior to the merger of Blue Ridge into Mutual Fund.

Upon the merger of Blue Ridge into Mutual Fund, Mutual Fund was the surviving corporation and issued its shares of stock in exchange for and upon delivery to it of the shares of stock in Blue Ridge.

Mutual Fund never acquired any, and has no, interest in the subject matter of the litigation herein.

Ridge Realization is the sole owner since June 15, 1951 of the claims which are the subject matter of this suit and of any avails thereof.

Ida Marco never demanded or requested the issuance to her of a certificate of stock of Ridge Realization and she determined not to make any demand therefor.

Ida Marco was not, at any time since June, 1951 until her death, a stockholder of either Ridge Realization or Mutual Fund.

After Marco v. Sachs was revived, Ida Marco was directed by the New York State Supreme Court to appear for examination before trial by the defendants on the subjects of stock ownership and her right to maintain the action. Ida Marco never appeared for such examination and deliberately and inexcusably refused to comply with orders of the Court that she submit to examination.

In Marco v. Sachs, plaintiff made no claim against any defendant involving the arrangement by Blue Ridge of October 24, 1930 until the filing of her bill of particulars in 1953.

In 1956, Ida Marco applied to be discharged as administratrix and ancillary administratrix of the estate of Harry Marco. Said discharges were granted. Ida Marco was directed to file her accounting, which she failed to do.

On or about January 7, 1958, a judgment was entered in the office of the Clerk of the County of Kings, State of New York, dismissing Marco v. Sachs on the findings by the Court of wilful failure and refusal of Ida Marco, as ancillary administratrix, to appear for and submit to examination before trial on the stockholder's right to maintain the action.

Prior to March, 1958, William Marco was appointed substitute administrator of the estate of Harry Marco in the place and stead of Ida Marco.

Plaintiff William Marco never acquired or had possession or custody of Blue Ridge stock certificate NYCO 11015.

Plaintiff William Marco never demanded or requested the issuance to him of a certificate of stock of Ridge Realization.

Plaintiff William Marco was not and at any time either in or since June, 1951 and is not now a stockholder of either Ridge Realization or Mutual Fund.

Prior to the commencement in this Court of Marco v. Dulles in 1958, neither Ida Marco nor plaintiff William Marco, nor anyone acting on behalf of either of them, made any demand whatsoever upon the board of directors or stockholders of Blue Ridge, or of Ridge Realization, or of Mutual Fund, to take any action to obtain redress for any wrongs asserted herein. There is no excuse in fact for such failure to make demand before suit.

Plaintiff and his attorney made no claim upon Ridge Realization or its transfer agent for a certificate of stock in Ridge Realization or for dividends declared upon the stock of Blue Ridge to the order of Harry Marco until December, 1965, after it had become apparent that the defendants were relying upon the absence of such claims as evidence the plaintiff had no rights as a stockholder of Ridge Realization or as a successor to a stockholder of Blue Ridge. The claim made by plaintiff and his attorney in December, 1965 is legally ineffective and is disregarded.

When this action was commenced in 1958, none of the directors of Blue Ridge

in office from 1930 through 1934, or in 1936, was a director or an officer of Ridge Realization or of Mutual Fund.

In March, 1958, the directors of Ridge Realization were Carl J. Austrian, Saul J. Lance, and Irving B. Stewart.

In this action, plaintiff made no claim against any defendant involving the arrangement of October 24, 1930 until the filing of the first amended complaint in 1963.

The second amended complaint in Marco v. Dulles served in 1964 does not assert any of the following as a basis for liability on the part of defendants:

(a) The decline in value of the collateral supporting the Conde Nast note of January 2, 1932;

(b) The alleged failure of Blue Ridge to sell and realize upon the collateral supporting said Conde Nast note;

(c) The sale of the Conde Nast note and its collateral in January, 1934.

Ridge Realization was a party to an action in the Tax Court of the United States entitled "Ridge Realization Corporation v. Commissioner," Docket No. 2907-62. Ridge Realization asserted therein that Blue Ridge had realized and had accordingly recorded on its books in or about 1932 a profit of $796,800 on the stock acquired by it through the transaction with respect to the sale to Conde Nast of the stock of Publications made by Blue Ridge on or about December 31, 1931. Ridge Realization induced the Tax Court so to find and such finding was made by the Tax Court in said proceeding.

The plaintiff William Marco did not appear at the trial of this action, nor was any evidence submitted on his behalf by way of deposition of William Marco making any assertion or claim to existence herein as a plaintiff or ownership or claimed ownership of any stock formerly belonging to Harry Marco.

Defendants are not chargeable with and were not connected with any loss, destruction or withdrawal of any records of Blue Ridge material to this case. The testimony that, at some unspecified time in 1936, there was a withdrawal of papers signed by or addressed to Harrison Williams was not related to or connected by any credible evidence to any documents involved or material to the issues in this case. The proof offered by plaintiff on this matter was vague and unconvincing. The testimony of the plaintiff's witness Popovic was unimpressive and not worthy of belief; and no inferences adverse to defendants are drawn therefrom. Said plaintiff's witness testified that papers relating to the Marco case, including reports prepared by him on Conde Nast were collected and turned over to Ridge Realization in 1951. Only one of such reports was produced on the trial by plaintiff and Ridge Realization.

Said plaintiff's witness testified that, in October, 1930, optimism prevailed among the Blue Ridge management; that their views were entertained in good faith; that they were honest men; and that he was the only one who was bearish in the office in October, 1930; that there was a state of gloom and business paralysis never before witnessed in the entire history of the country in December, 1931.

Having detailed its findings of fact, the Court now states its conclusions of law. These conclusions are in addition to those already expressed in the course of this opinion.

Defendants are entitled to a judgment dismissing the action against each of them on the merits, with prejudice to plaintiff, with costs against plaintiff and Ridge Realization. The Court concludes that plaintiff has failed, in every material respect, to make out a case on the facts and on the law. This conclusion is independent of the Court's resolution or disposition of the other issues tried herein, as hereinafter set forth or as otherwise indicated in the course of this opinion.

 Plaintiff William Marco is not a stockholder or equitable stockholder of Ridge Realization or Mutual Fund and has no capacity to sue as such.

Ida Marco transferred and conveyed Harry Marco's 35 shares of stock of Blue Ridge by endorsing and delivering the certificate, not to plaintiff herein, but to a person or persons unknown.

Plaintiff William Marco never owned or became entitled to Harry Marco's 35 shares of stock of Blue Ridge and has no right to maintain this action in a derivative or individual capacity.

The agreement of Blue Ridge connected with the loan transaction of October, 1930, the Conde Nast note transaction of January, 1932, and the sale of the Conde Nast note of January, 1934 were, at the times they were entered into, reasonable and were upon terms that were fair; and no director who voted upon any such transaction had any interest adverse to that of Blue Ridge therein; and any adverse interest of any director as to any such transaction was revealed to and known by the other directors of Blue Ridge.

The agreement of Blue Ridge connected with the loan transaction of October, 1930, the Conde Nast note transaction of January, 1932, and the sale of the Conde Nast note of January, 1934 were within the corporate powers of Blue Ridge.

With regard to the agreement of Blue Ridge connected with the loan transaction of October, 1930, the defendants who participated therein or approved thereof committed no fraud, did not act negligently, and acted in good faith in the exercise of honest informed business judgment and with reasonable diligence.

With regard to the Conde Nast note transaction of January 1932, the defendants who approved thereof committed no fraud, did not act negligently, and acted in good faith in the exercise of honest informed business judgment and with reasonable diligence.

With regard to the sale of the Conde Nast note of January, 1934, the defendant who approved thereof committed no fraud, did not act negligently, and acted in good faith in the exercise of honest informed business judgment and with reasonable diligence.

The payment to Goldman Sachs out of the proceeds of the loan by the Chase Bank to Vogue did not unfairly benefit Goldman Sachs or the defendants Weinberg and Sachs at the expense of Blue Ridge; and Goldman Sachs gave up full and fair value in exchange for the payment which it received out of the said proceeds.

The contracts, transactions, matters and things set forth or referred to in the minutes of the directors as the acts and proceedings of the board of directors and of the officers of Blue Ridge including the arrangements and transactions complained of in this action were in all respects approved, ratified and confirmed by the stockholders of Blue Ridge at the stockholders' meeting held respectively in 1931, 1932, 1933 and 1934; and no stockholder of Blue Ridge or of Ridge Realization may complain thereof.

■ The failure of Harry Marco to make demand upon the directors of Blue Ridge in office in 1936 for the redress of any wrongs arising out of transactions entered into by Blue Ridge from 1930 to 1934 before he began Marco v. Sachs was not excused.

The complaint in the *Pellegrino* case was not based on the same claim for relief as the original complaint in Marco v. Sachs.

Under the circumstances as shown by the evidence, the defense by the directors of Blue Ridge of the action brought by Joseph Pellegrino after Marco v. Sachs was pending does not excuse the failure of Harry Marco to make a demand before commencing Marco v. Sachs.

■ The statutes of limitation bar all claims in this action which are not the same as those alleged in the original complaint in Marco v. Sachs.

All claims against Walter E. Sachs herein are barred by the statutes of limitation; he was not charged with liability as a director in Marco v. Sachs.

The only claim herein which is for the same cause as that in the original complaint in Marco v. Sachs relates to the transaction of January 2, 1932 wherein

**658**

160,000 shares of the stock of Publications were sold to Conde Nast who gave his collateralized promissory demand note for $4,800,000 therefor.

The Court has not adjudicated the matter of reasonable expenses, including attorney's fees. The Court neither expresses nor intimates any views as to such matter.

The judgment dismissing the action herein to be entered in accordance with this decision is on the merits, with prejudice to plaintiff, and final in all respects, together with costs to defendants. Settle judgment on notice.